ORAL ARGUMENT NOT YET SCHEDULED

### No. 13-5292

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SECURITIES AND EXCHANGE COMMISSION,
PLAINTIFF-APPELLEE,

v.

MILAN GROUP, INC., A/K/A MILAN TRADING GROUP, INC.,
DEFENDANT,

BRYNEE K. BAYLOR,
DEFENDANT-APPELLANT,

BAYLOR & JACKSON, PLLC, ET AL.,
DEFENDANTS.

On Appeal from the United States District Court for the District of Columbia

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

ANNE K. SMALL
General Counsel

MICHAEL A. CONLEY
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

RANDALL W. QUINN
Assistant General Counsel

DANIEL STAROSELSKY
Senior Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-5774 (Staroselsky)

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

Plaintiff-Appellee

Securities and Exchange Commission

Defendant-Appellant

Brynee K. Baylor

Non-appealing defendants

Milan Group, Inc.

Frank L. Pavlico, III, a/k/a Frank Lorenzo

Baylor & Jackson, P.L.L.C.

Mia C. Baldassari

Elmo Baldassari

Brett Cooper

Global Funding Systems LLC

GPH Holdings, LLC

Dawn R. Jackson

The Julian Estate, Inc.

Patrick T. Lewis

Susan C. Kevra-Shiner

Law Office of Susan C. Kevra

i

Estate of Frank L. Pavlico, III

    <u>Movant</u>

Steven J. Hassing

## B.    Rulings Under Review

This appeal challenges the final judgment in case 11-cv-2132 entered by

Judge Rosemary M. Collyer on August 26, 2013, pursuant to Federal Rule of Civil

Procedure 54(b), granting the Commission's motion for summary judgment against

defendants the Estate of Frank Pavlico, III, Brynee K. Baylor, Milan Group, Inc.,

Baylor & Jackson P.L.L.C., Patrick Lewis, and the Julian Estate, Inc.  *SEC v.*

*Milan Group, Inc.*, 962 F. Supp. 2d 182 (D.D.C. 2013).  Defendant Brynee K.

Baylor is the only defendant who has appealed.

## C.    Related Cases

This case previously has not been before this Court.

Counsel is aware of the following private lawsuits currently pending in the

U.S. District Court for the District of Columbia that arise out of the same conduct

as that involved in this case:

- *World Class Construction Mgmt. Gr., LLC v. Baylor*, 11-cv-1682 (D.D.C.).

- *Arpad v. Baylor*, 12-cv-69 (D.D.C.).

TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ................................................. i

Table of Authorities ................................................................................... vi

Glossary ................................................................................................ x

Preliminary Statement ................................................................................ 1

Counterstatement of Jurisdiction ..................................................................... 3

Counterstatement of Issues ........................................................................... 4

Statutes and Regulations ............................................................................. 4

Counterstatement of the Case ......................................................................... 5

    A.    Statement of the Facts ...................................................................... 5

        1.    Baylor and Pavlico ..................................................................... 5

        2.    From mid-2010 through November 2011, Baylor and Pavlico perpetrated a prime bank fraud. ............................. 5

               *a.*    *Baylor guaranteed investors that they would obtain outsized returns from risk-free instruments that do not exist.* .................. 5

               *b.*    *Instead of investing funds as promised, Baylor used her law firm's IOLTA account as a revolving door to funnel the great majority of investors' funds to herself and Pavlico as supposed "fees."* .......... 7

               *c.*    *After investors deposited funds with her, Baylor falsely told them that she had verified, and could attest to the validity of, their non-existent investments.* ................. 9

**Table of Contents—Continued:**                                          **Page**

        *d.*    *Throughout 2011, Baylor continued to string along existing investors and to solicit new funds.* .........10

        *e.*    *Fall 2011: Baylor was caught on tape promoting the fraud to undercover FBI agents and assumed ownership of the transactions even after learning that Pavlico was using a false identity and was a convicted felon.* ...........................................12

    B.    Proceedings Below ..........................................................14

Standard of Review ...................................................................18

Summary of Argument ...............................................................19

Argument....................................................................................20

I.    The district court correctly granted summary judgment to the Commission on its antifraud claims. .........................................20

    A.    The undisputed evidence establishes that Baylor violated Section 17(a)(1), Section 10(b), and Rule 10b-5. ............................20

        *1.*    *There is no genuine dispute that Baylor knowingly or recklessly engaged in deceptive conduct.* ...........................20

        *2.*    *Baylor fails to show a genuine issue of fact that would preclude summary judgment.* .......................................23

    B.    The undisputed evidence establishes that Baylor violated Sections 17(a)(2) and (a)(3). ..............................................27

    C.    The undisputed evidence establishes that Baylor aided and abetted Pavlico's and Milan's violations of the antifraud provisions. ..........................................................29

II.    The district court correctly granted summary judgment to the Commission on the securities registration claim. ...................32

**Table of Contents—Continued:**                                    **Page**

III.    Baylor's challenge to the district court's imposition of remedies fails. .......33

    A.    Baylor has forfeited any challenge to the district court's
imposition of remedies. .......................................................................33

    B.    The district court did not abuse its discretion in ordering
disgorgement and a civil penalty.........................................................34

Conclusion .........................................................................................................37

Certificate of Compliance

Certificate of Service

Statutory Addendum

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
     511 U.S. 164 (1994)............................................................................24

*District of Columbia v. Straus*, 590 F.3d 898 (D.C. Cir. 2010)..............................33

*\*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000)................................. 20, 29, 30, 31

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004)....................................... 30, 31, 32

*Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997) .....................................................30

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ........................... 30, 31

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) (per curiam) .................................27

*Pinter v. Dahl*, 486 U.S. 622 (1988) ............................................................. 19, 32, 33

*SEC v. Asset Recovery & Mgmt. Trust, S.A.*, 2008 WL 4831738
     (M.D. Ala. Nov. 3, 2008) .................................................................................23

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000)......................................18

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989) ......................34

*SEC v. Gallard*, 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997) ................................23

*SEC v. George*, 426 F.3d 786 (6th Cir. 2005) .................................................. 21, 31

*SEC v. Graulich*, 2013 WL 3146862 (D.N.J. June 19, 2013) .................................23

*SEC v. Infinity Gr. Co.*, 212 F.3d 180 (3d Cir. 2000)..............................................21

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1 (D.D.C. 1998)................................23

\*  Authorities upon which we chiefly rely are marked with asterisks

**Cases—Continued:**                                     **Page**

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)................................................................18

*SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995).......................................................... 21, 32

*\*SEC v. Lyttle*, 538 F.3d 601 (7th Cir. 2008) ................................. 1, 23, 24, 25, 26

*SEC v. Milan Capital Gr., Inc.*, 2000 WL 1682761
    (S.D.N.Y. Nov. 9, 2000)...................................................................................23

*SEC v. Marino*, 29 Fed. App'x 3d 538 (10th Cir. Jan 25, 2002)...........................23

*SEC v. Phan*, 500 F.3d 895 (9th Cir. 2007) ..........................................................33

*SEC v. Reynolds*, 2010 WL 3943729 (N.D. Ga. Oct. 5, 2010)...............................23

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ...................................... 20, 26, 27

*SEC v. Wilde*, 2012 WL 6621747 (C.D. Cal. Dec. 17, 2012).................................23

*SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107 (2d Cir. 1998)...........................................24

*\*SEC v. Whittemore*, 659 F.3d 1 (D.C. Cir. 2011) .............................. 18, 34, 35, 36

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)........................................23

*United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001) ...................................... 21, 24

*United States v. Dazey*, 403 F.3d 1147 (10th Cir. 2005)........................................21

*United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013)......................................24

*United States v. Gravatt*, 951 F.2d 350 (6th Cir. 1991)...........................................21

*United States v. Keiser*, 578 F.3d 897 (8th Cir. 2009)............................................21

*United States v. Rude*, 88 F.3d 1538 (9th Cir. 1996)..............................................21

*Weiss v. SEC*, 468 F.3d 849 (D.C. Cir. 2006)............................................ 20, 27, 28

**Cases—Continued:** **Page**

*Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009) (per curiam)............... 19, 32, 33

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987).........................30

**Statutes and Rules**

Securities Act of 1933, 15 U.S.C. 77a, *et seq.* ("Securities Act")

Section 5, 15 U.S.C. 77e.................................................................16
Section 5(a), 15 U.S.C. 77e(a)............................................... 14, 16
Section 5(c), 15 U.S.C. 77e(c)............................................... 14, 16
Section 12(1), 15 U.S.C. 77*l*(a)........................................... 32, 33
Section 17(a), 15 U.S.C. 77q(a)...................................... 14, 20, 29
Section 17(a)(1), 15 U.S.C. 77q(a)(1) .................................. 16, 20
Section 17(a)(2), 15 U.S.C. 77q(a)(2) .................................. 16, 20
Section 17(a)(3), 15 U.S.C. 77q(a)(3) .................................. 16, 20
Section 20(b), 15 U.S.C. 77t(b) ...............................................3
Section 22(a), 15 U.S.C. 77v(a).................................................3

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.* ("Exchange Act")

Section 10(b), 15 U.S.C. 78j(b)................................. 14, 16, 20, 29
Section 15(a), 15 U.S.C. 78*o*(a)........................................... 14, 17
Section 20(e), 15 U.S.C. 78t(e) ...............................................29
Section 21(d), 15 U.S.C. 78u(d) ...............................................3
Section 21(e), 15 U.S.C. 78u(e) ...............................................3
Section 21(d)(3)(B), 15 U.S.C. 78u(d)(3)(B)..............................36
Section 27, 15 U.S.C. 78aa.......................................................3

Rule 10b-5 under the Exchange Act, 17 C.F.R. 240.10b-5.............. 4, 14, 16, 20, 29

28 U.S.C. 1291.....................................................................................3

Federal Rule of Appellate Procedure

Fed. R. App. 4(a)(1)(B) .............................................................3

**Rules—Continued:** **Page**

<u>Federal Rules of Civil Procedure</u>

Fed. R. Civ. P. 54(b) ....................................................................................3

Fed. R. Civ. P. 56(a)....................................................................................18

## GLOSSARY

A__                          Appellant's Appendix

Br.__                        Brief of Appellant

Dkt.                         Docket entries in the district court

IOLTA                        Interest on Lawyers' Trust Account

SA__                         Supplemental Appendix

ORAL ARGUMENT NOT YET SCHEDULED

### No. 13-5292

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SECURITIES AND EXCHANGE COMMISSION,
PLAINTIFF-APPELLEE,

V.

MILAN GROUP, INC., A/K/A MILAN TRADING GROUP, INC.,
DEFENDANT,

BRYNEE K. BAYLOR,
DEFENDANT-APPELLANT,

BAYLOR & JACKSON, PLLC, ET AL.,
DEFENDANTS.

On Appeal from the United States District Court for the District of Columbia

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

### PRELIMINARY STATEMENT

For more than a year, Brynee Baylor and Frank Pavlico perpetrated a well-known type of fraud often referred to as a "prime bank" fraud. "This is a common fraud in which the perpetrators solicit investments by telling prospective investors that the investors' money will be invested in high-yield bank-issued securities not available or even known to the general public." *SEC v. Lyttle*, 538 F.3d 601, 602 (7th Cir. 2008) (Posner, J.).

It is undisputed that the investment program that Baylor and Pavlico promoted did not exist and that Baylor never saw investors receive a penny from

the scheme. Yet, stressing her status as an attorney, Baylor assured investors that she had "observed" similar investments succeed in the past.

Comforted by Baylor's vouching for the non-existent investment program, investors wired millions of dollars to the Interest on Lawyers' Trust Account ("IOLTA") maintained by Baylor's law firm. But Baylor never invested those funds as promised. Instead, she paid more than two-thirds of that money to herself and Pavlico as "fees." When investors grew concerned about their investments, Baylor told them that she had conducted the "requisite inquiry," and could "verify," "validate," and "attest" to the legitimacy of the fraudulent instruments.

Based on these and other undisputed facts, the district court granted summary judgment to the Securities and Exchange Commission, holding that Baylor violated antifraud and registration provisions of the securities laws. On appeal, Baylor does not dispute that Pavlico committed fraud and that the instruments at the heart of this scheme were a sham. She nevertheless argues that she should escape liability based on her claims that she acted solely as an attorney for Pavlico and that Pavlico deceived her. But in view of Baylor's own many deceptive acts, these arguments fail to create a triable issue of fact as to her liability. The district court's order granting summary judgment should be affirmed.

## COUNTERSTATEMENT OF JURISDICTION

In this civil law enforcement action, the district court had jurisdiction under Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77t(b) and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78u(d), 78u(e), and 78aa.

On August 26, 2013, the district court entered a final judgment against Baylor pursuant to Fed. R. Civ. P. 54(b).  SA460-71.  On September 20, 2013, Baylor filed a notice of appeal.  SA472.  Baylor's appeal is timely under Fed. R. App. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. 1291.

## COUNTERSTATEMENT OF ISSUES

1.     Whether the district court correctly granted summary judgment to the Commission on its claims that Baylor committed securities fraud and aided and abetted violations by others.

2.     Whether the district court correctly granted summary judgment to the Commission on its claim that Baylor offered or sold securities in violation of the Securities Act's registration provisions.

3.     Whether Baylor's challenge to the disgorgement and civil penalties imposed by the district court fails because Baylor failed to make any argument regarding remedies in the district court and, therefore, has forfeited any objection to these determinations; and, in any event, the district court acted within its discretion in ordering Baylor to disgorge her ill-gotten gains and to pay civil penalties.

## STATUTES AND REGULATIONS

With the exception of Rule 10b-5, 17 C.F.R. 240.10b-5, which is reproduced in the addendum to this brief, all applicable statutes and regulations are reproduced in Appellant's Appendix.

**COUNTERSTATEMENT OF THE CASE**

**A.      Statement of the Facts**

      **1.      Baylor and Pavlico**

Baylor is an attorney who received her law degree *cum laude* in 2000.  A39-40, ¶¶1, 4-5.  In 2003, Baylor founded her own firm, where she touted her "extensive knowledge" in corporate and transactional law.  A40, ¶11, SA85-86.  Baylor's law school friend, Dawn Jackson, joined the practice that same year, and the firm became known as Baylor & Jackson, PLLC ("Baylor & Jackson").  A40, ¶12.

In early 2010, Baylor met defendant Frank L. Pavlico III, the CEO and president of The Milan Group, Inc., a/k/a The Milan Trading Group, Inc. ("Milan").  *See* A41-42, ¶¶21-28; SA63; SA223, Tr.8:16-17.  Having been convicted of a money-laundering felony, SA64-84, Pavlico was using the name "Frank Lorenzo" at the time.  A42, ¶28.  Upon Pavlico's death while this case was pending, his estate was substituted as a defendant.  *See* SA419-20.

      **2.      From mid-2010 through November 2011, Baylor and Pavlico perpetrated a prime bank fraud.**

            *a.      Baylor guaranteed investors that they would obtain outsized returns from risk-free instruments that do not exist.*

From mid-2010 through November 2011, Baylor and Pavlico perpetrated a prime bank fraud.  SA359, ¶14.  Defendants told investors that their funds would

- 5 -

be used to "lease" bank instruments, such as standby letters of credit, which would be "leveraged" to obtain an instrument in an exponentially larger amount.  *Id.*, ¶15. That instrument then would be "monetized," producing funds which purportedly would be used for trading that would yield the promised returns.  *Id.*; *see also* A70, Tr.106:5-10; SA211, Tr.146:14-19; SA139-44, SA177, 212 (written descriptions of trading).  An uncontested expert report demonstrated that these transactions "do not and cannot exist in legitimate finance."  SA385, ¶94.  Therefore, the defendants were promising a "mythical return on a fictional investment."  *Id.*, ¶94(f); *see also generally* SA88-98 (publicly available warnings from federal regulators advising of dangers of investments of the sort advertised here).

Baylor played a crucial role at every step of this fraud, using her status as an attorney to lend credibility to the scheme.  At the outset, Baylor assured investors orally and in writing that their principal would be "guaranteed."  A65, Tr.24:6-25:9; *see also* A66, Tr.26:23-24 ("They told us if the transaction didn't come off, then the money would be returned."); SA177, SA244, ¶1 (written promise that Milan would return the investor's principal within seven days after it was invested); SA242-43, ¶¶5, 8 (oral representation to investor that his "loan would be repaid in a few weeks with a 100% return" and that "no investor had ever lost money in these transactions").  Baylor also told investors that she "had been involved in numerous successful bank instrument transactions with [Pavlico], and

that the investment program in which [the investor] was being invited to participate had been successful in the past and had returned millions to investors."  A74, ¶7; *see also* A68, Tr.90:20-91:11; SA242-43, ¶8.

According to Baylor's and Pavlico's representations, these risk-free investments were expected to provide massive returns.  SA363, ¶31 (discussing returns ranging from 367% to $11,558% annually).  For instance, Baylor told an investor that a contribution of $75,000 would yield profits of $1.5 million within 60 days.  A66, Tr.26:7-20.

> b.    *Instead of investing funds as promised, Baylor used her law firm's IOLTA account as a revolving door to funnel the great majority of investors' funds to herself and Pavlico as supposed "fees."*

Encouraged by Baylor's representations, investors wired their contributions to Baylor's law firm's IOLTA account.  *See* SA310, ¶72; *see generally* SA99-138. As the managing partner of her firm, Baylor signed Attorney Escrow Agreements governing those deposits.  *See* SA212-20.  Although the terms of those agreements varied slightly, in general, they promised investors that their funds would be used to lease or acquire certain financial instruments.  *See id.*

In fact, a review of the records found no evidence that Baylor and Pavlico ever purchased or leased any such instrument.  SA309-10, ¶70.  Instead, Baylor used the IOLTA account as a "revolving door," SA441, to pay herself, Pavlico, and certain individuals and entities that received proceeds of the fraud as to which they

- 7 -

had no legitimate gain ("relief defendants").  In one illustrative example, on October 27, 2010, an investor group deposited $775,000 into the Baylor & Jackson IOLTA account.  SA108.  On the very next day, Baylor wired $313,000 to Milan, supposedly as payment for fees, and $212,000 to the Baylor & Jackson partner account—leaving only $250,000, or less than one-third of the original deposit, to be used for any "investment."  *See* SA109; Dkt. 109-3, ¶74.  Other transactions followed a similar pattern.  *See* Dkt. 109-3, ¶76 (Baylor and Pavlico distributed over two-thirds of an investor's funds to themselves  as "fees" within days after the funds were delivered to the Baylor & Jackson IOLTA account); SA104-05.

In total, Baylor and Pavlico distributed more than 70% of investor funds to themselves as "fees," with the remainder going to the relief defendants.  Dkt. 109-3, ¶68; SA309-14, ¶¶68-79.  It is undisputed that Baylor never disclosed to investors the percentage of their investments that were swallowed by "fees."  SA167, Tr.143:17-20; SA171, Tr.279:15-21.  Nor did she disclose that funds that were deposited for investment in Baylor & Jackson's IOLTA account often were used to pay for "fees" that Baylor had purportedly earned in work done for entirely different Milan investors.  SA324, Tr.143:12-145:14.

> c.  After investors deposited funds with her, Baylor falsely
> told them that she had verified, and could attest to the
> validity of, their non-existent investments.

As their investments predictably failed to bear fruit, investors took their

concerns to Baylor.  *See, e.g.*, A70, Tr.108:1-109:8.  In response, stressing her

position as an attorney, Baylor personally reassured them that the alleged

transactions were viable.  For example, in an October 11, 2010, email that she

wrote "to confirm the validity" of a transaction that had been initiated in August,

Baylor—signing her name as "Esquire"—stated:

> First, I have observed this company successfully complete
> transactions of this nature whereby participants received their funds as
> agreed.  Second, I have personally been involved in this transaction
> and can validate it as well as confirm the fact that the transaction is
> moving along very well.

SA159; A70, Tr.108:1-109:8.

Several weeks later, Baylor sent investors a notarized "Attorney Attestation"

letter in which she purported (1) to "verif[y]" information provided to her by

Pavlico about a pending deal; and (2) to "attest[]" that the information she was

providing was "true."  SA160.  Likewise, in December 2010, she wrote to

investors that after "conduct[ing] the requisite inquiry," she could represent that

their principal contributions would be protected.  SA177.

Baylor repeatedly admitted at her deposition that the truth was that she never

saw "any evidence that any of these deals came through," SA333, Tr.306:17-20,

and that she and Pavlico "never received or [were] aware of receiving [any] profits," SA164, Tr.70:14-16; *see also* SA320, Tr.106:6-8; SA332, Tr.300:15-301:6; SA335, Tr.327:7-10; SA336, Tr.381:6-16; SA340, Tr.397:12-14; SA345, Tr.434:8-10.  Rather, as Baylor put it, "Milan received its fees and Baylor & Jackson received its fees and to my knowledge investors have not been paid back." SA170, Tr.210:17-19; *see also* SA341, Tr.417:8-12 (admitting that none of the investors "got a penny back").

And although Baylor claimed to validate the integrity of the transactions, Baylor could not explain the mechanics of those transactions whatsoever.  SA329, Tr.271:17-18 (conceding that she did not "know specifically how" a transaction could generate a 250% return in 40 days, but stating that she "just kn[e]w" that it did happen); *see also* SA329, Tr.274:1-3; SA346, Tr.438:5-8; SA349, Tr.582:6-16. For instance, she could not explain why principal contributions of different amounts (for example, $250,000 or $350,000) would be used to obtain bank instruments of the same amount of $10 million, as she and Pavlico had told investors.  *See* SA351, Tr.590:13-593:15.

> d.    *Throughout 2011, Baylor continued to string along existing investors and to solicit new funds.*

In 2011, investors grew increasingly desperate and implored Baylor to provide updates on the status of their supposed transactions.  *See generally* SA179-207.  As an attorney for one of the investors wrote to Baylor:  "My clients need

evidence not just an email as they had emails from Baylor & Jackson and Milan

Group with updates and nothing has transpired of those updates for the closing."

SA180; *see also* SA192 (seeking a "simple yes or no answer" as to status of

transaction and noting that investors "have been waiting for 6 months to get paid");

SA203 (complaining about "excuses and delays" and stating, "I don't know who is

lying and making up stories").

At times—as is common in such schemes, *see* SA380-81, ¶¶74-76—Baylor

replied that she would not provide further information because the details of the

deal were secret. *E.g.*, SA179. Other times, Baylor claimed that the transaction

was "on track" and would begin any day. SA185. On one day in the summer of

2011, for example, Baylor reported "Excellent news![,]" wrote that she was "very

happy that the light at the end of the tunnel [had] appeared," and claimed that one

of the transactions "was successfully resolved [that] afternoon!!!" SA187.

The deals never materialized, of course, yet Baylor continued to solicit funds

for additional investments. In August 2011, she told an investor that for a

$250,000 contribution he was "guaranteed" to obtain a return of $25 to $35 million

in weekly payouts over the course of fifty weeks. A74, ¶¶5, 7. By this point,

Baylor knew that one of the parties to an earlier transaction who was supposed to

set the investment in motion instead had stolen investors' contribution, and that

this individual previously had "legal issues" in respect to "taking people's money."

SA321-22, Tr.134:19-136:4.  Yet Baylor told the investor that the transaction was

safe and, despite never having seen any similar investment succeed, assured the

investor that the program "had been successful in the past and had returned

millions to investors."  A74, ¶7.  After the investor wired his $250,000 to Baylor &

Jackson's IOLTA account, he never saw that money again.  A74-75, ¶¶7-9, 11.

> e.    *Fall 2011:  Baylor was caught on tape promoting the*
> *fraud to undercover FBI agents and assumed ownership*
> *of the transactions even after learning that Pavlico was*
> *using a false identity and was a convicted felon.*

In late September 2011, Baylor spoke by telephone with undercover FBI

agents posing as investors seeking to raise funds to provide medical care for

children.  SA149, SA154.  By then, Baylor had been personally sued in four

private lawsuits filed by Milan investors who alleged that she had committed fraud

in this very scheme.  SA246-301.[1]  She also was "aware" at the time that investors

had brought millions of dollars into the scheme but had not received a "penny."

SA341, Tr.416:12-417:12.

Yet, after acknowledging that speaking with an attorney is "comforting,"

SA150; *see also* SA156, Baylor confirmed that a $1 million investment would

return 250% within thirty days and said that she had seen similar investments be

---

[1]     Baylor claimed in her deposition that she had not been served with several of
the complaints, which were filed close to the time of the FBI call.  SA344, Tr.427.
She admitted, however, that she was aware of at least one of the lawsuits, which
was filed in March 2011.  SA343, Tr.425:20-426:11; *see also* SA246.

successfully completed.  SA151, SA153.  She also volunteered that this sick

children's group had "lucked out" because she claimed not to have realized that

Pavlico was still taking outside clients.  SA154.  As to why Pavlico was willing to

extend the invitation, Baylor stated that he was dealing with "some illness in his

family," and therefore likely was moved by these investors' desire to help sick

children.  *Id.*

By November 2011, Baylor had learned that Pavlico was using a false name

and that he had a felony conviction.  A54-55, ¶¶120-24.  But she continued to

correspond with investors, telling them that a transaction in which they were

involved would succeed "at any point."  SA206.  When an investor wrote that he

was tired of the delays, Baylor replied:  "Trust and believe I am tired of this as

well!  This is MY deal, not someone else's transaction."  SA202; *see also* A71-72,

Tr.197:7-201:5 (investor testimony describing transaction that Baylor was handling

on her own, separately from Pavlico).

**B.    Proceedings Below**

1.    On November 30, 2011, the Commission filed its complaint against Baylor, Pavlico, Baylor & Jackson, and Milan, alleging violations of antifraud and registration provisions of the federal securities laws.  *See generally* SA36.[2]  In addition, the Commission's complaint asserted claims against relief defendants alleged to have received ill-gotten gains from the fraud.  SA55-56, ¶¶85-86.

Together with the filing of its complaint, the Commission moved for a temporary restraining order ("TRO") in which the Commission requested the court to halt the ongoing scheme and to freeze the defendants' and relief defendants' assets.  Dkt. 3.  The district court granted the Commission's motion and later entered a preliminary injunction that largely continued the relief awarded in the TRO.  *See* Dkts. 4, 22.

---

[2]    Specifically, the Commission alleged that:  each defendant committed fraud in violation of Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, thereunder; Pavlico, Baylor, and Baylor & Jackson aided and abetted Milan's violations of Section 10(b) and Rule 10b-5; each defendant committed fraud or obtained money or property by means of material misstatements or omissions in violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a); Pavlico, Baylor, and Baylor & Jackson aided and abetted Milan's violations of Section 17(a) of the Securities Act; each defendant offered or sold securities while no registration statement was in effect as to those securities, in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. 77e(a) and (c); Baylor and Baylor & Jackson aided and abetted Pavlico's and Milan's violations of Sections 5(a) and (c) of the Securities Act; Pavlico and Baylor sold securities without being registered as a broker-dealer, in violation of Section 15(a) of the Exchange Act, 15 U.S.C. 78*o*(a).  SA52-55, ¶¶65-84.  The Commission subsequently amended the complaint to add one new relief defendant, and to remove three other relief defendants.  *See* Dkt. 51-1.

2.     After discovery, the Commission moved for summary judgment against each of the defendants and the relief defendants still remaining in the case. Dkt. 109.  While the Commission's motion was pending, Pavlico committed suicide ahead of a bond revocation hearing in a criminal case where he was facing charges for the same conduct underlying this case.  SA419-20 & n.3.

On August 26, 2013, the district court issued an extensive opinion in which it concluded that the Commission was entitled to summary judgment against each of the defendants.  SA415-59.[3]  The court began its analysis by discussing the uncontroverted report of Professor James E. Byrne, an expert who concluded that the defendants operated a "classic" prime bank scheme.  SA429-32.  As the court held, Professor Byrne demonstrated that the investments that the defendants offered were "no more real than unicorns, offering a 'mythical return on a fictional instrument.'"  SA431.   Moreover, as in other similar schemes, the defendants used "nonsensical terms … to describe fictional financing instruments, explain delays, and lull investors."  *Id.*  Noting that none of the defendants—including Baylor—contested Professor Byrne's report, the court held that Pavlico and Milan engaged in fraud.  SA431-32.

---

[3]     The court granted the Commission's motion as against several relief defendants, but denied it in whole or in part as against other relief defendants. SA442-59.  Subsequently, the Commission resolved its liability case against all relief defendants.  *See* Dkts. 182; Dkt. 195-1 at 2, n.1.

Turning to Baylor, the court concluded that the undisputed facts showed that she also committed fraud in violation of the scienter-based antifraud provisions in Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), Rule 10b-5, 17 C.F.R. 240.10b-5, and Section 17(a)(1) of the Securities Act, 15 U.S.C. 77q(a)(1). SA432-42.  The court held that Baylor was liable under these provisions because the record was "clear" that she actively engaged in deceptive conduct, while acting with "extreme recklessness."  SA433.  For example, although Baylor "never observed Milan complete a single transaction in which participants received their funds," she "used her authority as an attorney to attest to personal involvement and offer repeated validations" of the transactions in issue.  SA438.

Further, the court held that even if doubt "might possibly exist" regarding Baylor's liability under Section 10(b), Rule 10b-5, and Section 17(a)(1), Baylor "very clearly" (i) violated Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. 77q(a)(2), (3), which permit a finding of liability upon a showing that the defendant acted negligently; and (ii) aided and abetted Pavlico and Milan in their violations.  SA434.

Finally, the court granted summary judgment to the Commission on its claims that Baylor offered and sold unregistered securities in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. 77e(a) and (c); aided and abetted Pavlico's violations of Section 5 of the Securities Act, 15 U.S.C. 77e; and sold

securities without being registered as a broker-dealer in violation of Section 15(a) of the Exchange Act, 15 U.S.C. 78*o*(a).  SA441-42.

3.      The district court awarded the Commission remedies against Baylor. SA460-71.  First, the court entered permanent injunctions restraining Baylor from future violations of the securities laws she violated.  SA462-67.  In addition, the court found Baylor jointly and severally liable with Baylor & Jackson, Pavlico's estate, and Milan for disgorgement of $2,665,000—the total sum that the defendants raised from investors—together with pre-judgment interest.  SA467.

Finding that defendants' violations "involved fraud and deceit which resulted in substantial losses to other persons," the court also imposed joint-and-several third-tier civil penalties against Baylor and her law firm.  SA469-70.  The court calculated the amount of those penalties to be $746,266, SA470, which represents the total amount of money from the fraud that was deposited in the Baylor & Jackson partnership account, *see* Dkt. 109-3, ¶55.

4.      Baylor filed a timely notice of appeal.  SA472.  On appeal, Baylor does not challenge the district court's conclusion that she sold securities without being registered as a broker-dealer in violation of Section 15(a) of the Exchange Act or the court's imposition of injunctive relief.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment *de novo*.  *SEC v. Banner Fund Int'l*, 211 F.3d 602, 615 (D.C. Cir. 2000).  Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

This Court reviews a district court's award of disgorgement and civil penalties for abuse of discretion.  *SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011) (disgorgement); *SEC v. Kern*, 425 F.3d 143, 153-54 (2d Cir. 2005) (civil penalties).  A district court's calculation of the disgorgement amount is reviewed for clear error.  *Whittemore*, 659 F.3d at 7.

## SUMMARY OF ARGUMENT

1.     The district court correctly held that Baylor violated antifraud provisions of the securities laws because the undisputed evidence shows that she personally engaged in deceptive conduct.  In particular, Baylor has not shown that there are disputed factual issues with respect to whether she acted with scienter.  At the very least, the district court correctly held that there is no factual dispute that Baylor acted negligently.  Nor has Baylor identified any genuine dispute with regard to the facts underlying the court's determination that she aided and abetted Pavlico's fraud.

2.     The district court correctly held that Baylor offered and sold securities in violation of the registration provisions of the Securities Act.  Baylor argues that *Pinter v. Dahl*, 486 U.S. 622 (1988), precludes a finding of liability here, but this Court has held that *Pinter* "plainly is of no use" to a defendant in these circumstances because the applicable statutory term in *Pinter*, involving a private right of action, does not appear in the statute involved here.  *Zacharias v. SEC*, 569 F.3d 458, 467 (D.C. Cir. 2009) (per curiam).

3.     Baylor has forfeited her objection to the district court's award of disgorgement and civil penalties because she failed to make any argument as to remedies in the district court.  In any event, the district court acted well within its discretion in fashioning relief.

- 19 -

**ARGUMENT**

## I. The district court correctly granted summary judgment to the Commission on its antifraud claims.

Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities. *See Graham v. SEC*, 222 F.3d 994, 1000, 1002-03 (D.C. Cir. 2000). To prove a violation of Section 17(a)(1), and Section 10(b) and Rule 10b-5, the Commission must show that a defendant acted with scienter—that is, with the intent to deceive, manipulate, or defraud. *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992). This showing can be satisfied by proof that the defendant acted knowingly or recklessly. *Graham*, 222 F.3d at 1000. In contrast, "[p]roof of negligence is sufficient" to establish a violation of Sections 17(a)(2) and (a)(3). *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006).

### A. The undisputed evidence establishes that Baylor violated Section 17(a)(1), Section 10(b), and Rule 10b-5.

#### 1. There is no genuine dispute that Baylor knowingly or recklessly engaged in deceptive conduct.

The record clearly shows that Baylor engaged in knowing or reckless misconduct. For more than a year, Baylor told investors that they would obtain astronomical returns from trading in risk-free bank instruments. *E.g.*, A65, Tr.24:2-25:9; A66, Tr.26:7-20; A74, ¶7. But an uncontested expert report demonstrated that the transactions were a sham, promising a "mythical return on a

- 20 -

fictional investment." SA385, ¶94(f). Many courts have concluded in similar circumstances that the instruments of the sort Baylor promoted simply "do not exist," making any investment in them a "complete and barefaced" fraud. *SEC v. Lauer*, 52 F.3d 667, 669-70 (7th Cir. 1995) (Posner, J.).[4] The same result should follow here.

Baylor also committed fraud by using her law firm's IOLTA account as a "revolving door," SA441, to funnel money to herself, Pavlico, and the relief defendants. *See supra* at 7-8. There is no evidence that Baylor or Pavlico ever used investors' funds to purchase or lease standby letters of credit or other bank instruments, as they had promised. SA309-10, ¶70. It is also undisputed that Baylor transferred more than 70% of the funds deposited into her law firm's IOLTA account for her own and Pavlico's personal benefit without disclosing that to investors. Dkt. 109-3, ¶68; SA167, Tr.143:17-20; SA171, Tr.279:15-21. Such undisclosed spending of investor funds on personal expenses instead of investment constitutes securities fraud. *SEC v. George*, 426 F.3d 786, 795 (6th Cir. 2005); *SEC v. Infinity Gr. Co.*, 212 F.3d 180, 192 (3d Cir. 2000).

---

[4]  *See also United States v. Bollin*, 264 F.3d 391, 400-02 (4th Cir. 2001) (investments in prime bank instruments are "complete frauds" because they "do not exist"); *United States v. Gravatt*, 951 F.2d 350, at *2 (6th Cir. 1991) ("there are no such things" as "prime bank notes"); *United States v. Keiser*, 578 F.3d 897, 900 (8th Cir. 2009) (prime bank instruments are "fictitious"); *United States v. Dazey*, 403 F.3d 1147, 1156-57, 1171 (10th Cir. 2005) (prime bank instruments "do not exist"); *United States v. Rude*, 88 F.3d 1538, 1548-49 (9th Cir. 1996) ("the very notion of a 'prime bank note' [is] fictitious").

Baylor compounded the fraud when she falsely told investors after they invested that, as an attorney, she could "validate" the transactions at issue. SA159, *see also* SA160, SA177. Whereas she assured investors that she "observed" Milan "successfully complete" transactions such as those she was promoting, SA159, it is undisputed that, in fact, she never saw "any evidence that any of these deals came through," SA333, Tr.306:17-20.

Finally, Baylor continued to engage in the fraud even as it became increasingly apparent that the entire investment program was a sham. Despite having seen no evidence of any of the summer 2010 (or any other) investments succeeding, she strung along existing investors and solicited new funds. *See generally* A73-75; SA179-207. More than a year into her participation in the fraud, she told undercover FBI agents she thought were investors raising money for sick children that they had "lucked out" because Pavlico invited them to invest with him. SA154. And even after learning that Pavlico was a convicted felon operating under a false name, Baylor continued to correspond with investors, telling them that returns were imminent. SA202, SA206.

In light of this evidence, Baylor's assertion that there is "no evidence that [she] made a material misrepresentation," Br.13, is insufficient to create a genuine dispute of material fact that would warrant a trial. To the extent that Baylor is suggesting that her deception was not material, that argument is meritless.

Investors obviously would have found it important that: the instruments Baylor promoted did not exist; her claim to have personally observed them succeed was false; she failed to invest any of their funds, as she had promised, and instead transferred the great majority of the money to herself and Pavlico; and she continued to promise results and solicit new investors, even as she continued to have no evidence that the transactions were viable. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that materiality may be resolved at summary judgment when deception is "so obviously important to an investor[] that reasonable minds cannot differ" on the issue). Thus, as in numerous other similar cases, the district court correctly held that the Commission was entitled to judgment as a matter of law.[5]

> ## 2. *Baylor fails to show a genuine issue of fact that would preclude summary judgment.*

a.     Baylor repeatedly argues that she was "only acting in her capacity as the attorney for Milan and [Pavlico]." Br.11; *see also* Br.12. But "[a]ny person or entity, *including a lawyer*," may be held liable for securities fraud, "assuming *all*

---

[5]     *See, e.g.*, *SEC v. Lyttle*, 538 F.3d 601 (7th Cir. 2008); *SEC v. Marino*, 29 Fed. App'x 538 (10th Cir. Jan. 25, 2002); *SEC v. Graulich*, 2013 WL 3146862 (D.N.J. June 19, 2013); *SEC v. Wilde*, 2012 WL 6621747 (C.D. Cal. Dec. 17, 2012); *SEC v. Reynolds*, 2010 WL 3943729 (N.D. Ga. Oct. 5, 2010); *SEC v. Asset Recovery & Mgmt. Trust, S.A.*, 2008 WL 4831738 (M.D. Ala. Nov. 3, 2008), *SEC v. Milan Capital Gr., Inc.*, 2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000) (despite the name similarity, apparently unrelated to this case); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1 (D.D.C. 1998); *SEC v. Gallard*, 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997).

- 23 -

of the requirements for primary liability … are met." *Central Bank of Denver,*

*N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (first

emphasis added); *see also id.* (recognizing that "[i]n any complex securities fraud

… there are likely to be multiple violators").  Accordingly, Baylor is wrong to

suggest that her status as an attorney insulates her from liability for fraud.  *See*

*United States v. Bollin*, 264 F.3d 391, 407-08 (4th Cir. 2001) (affirming attorney's

conviction of wire fraud in prime bank scheme); *SEC v. U.S. Env't'l, Inc.*, 155 F.3d

107, 112 (2d Cir. 1998) (recognizing that lawyers "who engage in fraudulent or

deceptive practices at their clients' direction" may be held liable for fraud).

Baylor nevertheless insists that she "did not have a duty to speak" and that

"she was operating under her duty as an attorney[,] which was to communicate on

behalf and in the interest of her client, Milan."  Br.13.  But Baylor's claim that her

duty ran to Milan, not to investors, is unavailing because "[d]eceit is not an

accredited tool of which a lawyer may avail himself in the representation of a

client."  *United States v. Gordon*, 710 F.3d 1124, 1145 n.23 (10th Cir. 2013).

To the extent that Baylor is asserting that summary judgment was improper

because she was merely repeating misrepresentations that Pavlico conveyed to her,

that argument also fails.  As the Seventh Circuit held in a similar case, "[o]ne

doesn't have to be the inventor of a lie to be responsible for knowingly repeating it

to a dupe." *Lyttle*, 538 F.3d at 604 (holding that such an "I am just a copying machine" defense was insufficient to raise a triable issue of fact).

b.     In addition to her legal argument about her status as an attorney, Baylor argues that there are several disputes of material fact that make summary judgment improper in this case. These arguments lack merit.

First, Baylor argues that summary judgment was improper because "she had no knowledge of the details" of the underlying transactions. Br.11. But this concession makes Baylor's conduct all the more deceptive given that she claimed to have "attest[ed]" and "verified" that the deals were legitimate. SA160.

Baylor next contends that the fraud was "elaborate enough to convince attorneys [for the victims]," and contends that the district court improperly held her "to a much higher standard" than those lawyers. Br.11. But unlike those other attorneys, Baylor claimed to have done the "requisite inquiry" on the supposed transactions, SA177, something she was in a unique position to do given her repeated claims to investors that the details of the transaction were secret, *see, e.g.*, SA179; SA380-81, ¶¶74-76. Moreover, she cannot complain that the victims of her fraud were convinced when she was the one doing the convincing. *See Lyttle*, 538 F.3d at 604-05 (rejecting a "better liar" defense where the defendant claims that "if a lie is skillful enough to deceive the person lied to, it must have deceived

- 25 -

the liar as well," and holding that this defense was insufficient to stave off summary judgment).

Baylor also claims that she herself was fooled by Pavlico, as evidenced by a supposed transaction where she "allowed her elderly mother who is in her care to invest with Milan." Br.11. This contention fails to establish a genuine dispute of material fact for two reasons. First, although Baylor introduced into the record a check that her mother wrote to her in March 2011, SA355, there is no evidence that any portion of that amount was invested or that Baylor even transferred that money to Milan. *See* SA311-12, ¶75 (showing that Baylor did not transfer any funds to Milan during time frame when Baylor received money from her mother).

Second, even if such an investment took place, and it showed that Baylor believed Pavlico's many misrepresentations, that would not establish any genuine dispute of fact as to Baylor's own misstatements and deceptive acts. This is especially true with respect to the misrepresentations Baylor made months after the purported investment by her mother, when Baylor continued to actively promote additional, facially implausible transactions. *See generally* A73-75 (the August 2011 investment); SA145-58 (the September 2011 offer to the sick children's group).

Finally, contrary to Baylor's argument, Br.14, this case is nothing like *SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992). There, this Court reversed a finding

of scienter that was "based solely on … evidence that Steadman, although not a practicing lawyer, [was] a graduate of the Harvard Law School and that he and the directors of [defendant] Funds had extensive experience in the securities industry." *Id.* at 642. In contrast, Baylor's scienter is evident from undisputed evidence that she engaged in deceptive conduct, not simply from the fact that she is an attorney. Moreover, although Baylor asserts that she spoke with lawyers who made her believe the deals were legitimate, Br.3-4, unlike Steadman, Baylor cannot point to any formal, unqualified opinion letter from an attorney telling her that her own conduct was lawful. *Steadman*, 967 F.3d at 642.

## B. The undisputed evidence establishes that Baylor violated Sections 17(a)(2) and (a)(3).

The district court correctly held that even if doubt "might possibly exist" as to whether Baylor acted with scienter, the record "very clearly" shows that she negligently engaged in deceptive acts in violation of Sections 17(a)(2) and (a)(3) of the Securities Act. SA434. In fact, Baylor makes no argument in her opening brief regarding these provisions and as a result has forfeited any objection to this aspect of the district court's holding. *See New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (per curiam).

In any event, the undisputed evidence amply supports the district court's negligence finding. In *Weiss*, this Court held that an attorney acted negligently in violation of Sections 17(a)(2) and (a)(3) when he inaccurately affirmed that a "too

good to be true" opportunity was legal, while failing to conduct an independent legal inquiry and relying instead on "vague" and "conclusory" representations from his client.  468 F.3d at 852, 856.  The same is true here.

A practicing attorney, Baylor claimed to have "extensive knowledge" in corporate and transactional law.  A39, ¶1; SA86.  Yet, like the attorney in *Weiss*, it is undisputed that she simply accepted what others had told her without performing anything resembling due diligence.  *E.g.*, SA334, Tr.326:21-327:13 (although Baylor had not "personally seen any transaction complete successfully," in telling investors the contrary, she was relying on conversations with Pavlico and others); SA336, Tr.381:6-16 (admitting that she had seen "absolutely no evidence" that transactions took place, but claiming that she had spoken with people who had explained them to her); SA347, Tr.543:5-544:19 (similar).  *But cf.* SA348, Tr.560:3-6 (agreeing that one of the purposes of Baylor's writing attestation letters was to provide "independent confirmation other than from [Pavlico]" regarding the deals).

Baylor's negligence is also evident from her conceded failure, *see* SA344, Tr.428:21-430:4, to discover public warnings about prime bank schemes, *e.g.*, SA88-98, even though such warnings are "readily available and can be obtained by any person with access to a computer or a telephone," SA362, ¶28.  *See also* SA362, ¶28 (expert report stating that "any person professionally experienced in

- 28 -

investments should be aware of these warnings or be able to readily access them.").
And Baylor failed to have any reasonable basis for her outlandish conclusion that
the transactions were not subject to federal oversight, as she had told the sick
children's group.  SA338-39, Tr.387:17-391:11.

### C.    The undisputed evidence establishes that Baylor aided and abetted Pavlico's and Milan's violations of the antifraud provisions.

The district court correctly concluded that "[a]t a minimum, Ms. Baylor used
her professional position to aid and abet" Milan's and Pavlico's violations of the
antifraud rules.  Three principal elements are required to establish liability for
aiding and abetting another's violation:  (1) that a principal committed a violation;
(2) that the aider and abettor provided substantial assistance to the violator; and (3)
that the aider and abettor rendered such assistance knowingly or recklessly.
*Graham*, 222 F.3d at 1000; Section 20(e) of the Exchange Act, 15 U.S.C. 78t(e).
The undisputed facts establish that all three elements are satisfied here.

*First*, Baylor does not dispute—and the undisputed evidence plainly
shows—that Milan and Pavlico violated Section 17(a) of the Securities Act, and
Section 10(b) of the Exchange Act and Rule 10b-5.

*Second*, there is no genuine dispute that Baylor provided "substantial
assistance" to Milan's and Pavlico's violations.  A secondary actor provides
"substantial assistance" if he in some sort associates himself with the unlawful

venture, participates in it as something that he wished to bring about, and seeks by his action to make it succeed. *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 36 (D.C. Cir. 1987), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).

In this case, the undisputed evidence shows, among other things, that (1) both before and after investors sent funds to Baylor, she used her status as an attorney to "validate" the non-existent transactions; and (2) Baylor used her law firm's IOLTA account as a pass-through for investor funds to go to Pavlico. *See Graham*, 222 F.3d at 1004 (holding that broker who executed fraudulent trades for client substantially assisted the client's fraud).

Finally, the undisputed facts also establish that Baylor acted with the requisite scienter. Extreme recklessness, which is sufficient to support aiding and abetting liability, may be found if the alleged aider and abettor "encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violator." *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004) (quoting *Graham*, 222 F.3d at 1006).

Here, the transactions themselves were red flags because they promised unattainable, yet somehow risk-free, rates of return. *See Graham*, 222 F.3d at 1005 (holding that "economically irrational trading was a large red flag"); *see also Meadows v. SEC*, 119 F.3d 1219, 1226-27 (5th Cir. 1997) (promises of "low-risk

investments that were virtually certain to yield a high return" were "disturbing facts" supporting a finding of recklessness); *George*, 426 F.3d at 793-94 (similar). The investments' failure to materialize as time went on was another "suspicious event[] creating reasons for doubt." *Graham*, 222 F.3d at 1006; *see also id.* at 1005 (primary violator's financial difficulties, coupled with suspicious trading, were red flags). Finally, by March 2011, Baylor personally had been sued for her role in the scheme and knew that a central figure in the transactions had a history of "legal issues" vis-à-vis "taking people's money." SA321-22, Tr.134:19-136:4; SA246.

Baylor argues in response that she consulted the District of Columbia Bar and withdrew from representing Milan when she found out that Pavlico was a felon. Br.15-16. But this contention does not create a genuine dispute of fact as to her scienter because Baylor substantially assisted the fraud long before she found out about Pavlico's past, notwithstanding all the other red flags that she ignored.

Likewise unavailing is Baylor's reliance, Br.15, on this Court's decision in *Howard*. In that case, this Court rejected the Commission's finding that Howard acted recklessly where "rather than red flags, Howard encountered green ones, as outside and inside counsel approved transactions and counted sales that, the SEC later determined, [should have been treated differently] under a rule whose language was silent on the subject." *Howard*, 376 F.3d at 1147.

- 31 -

In this case, in contrast, the transactions were highly suspicious on their face; there were abundant other red flags indicating that Milan was a blatant fraud; and, unlike Howard, *see* 376 F.3d at 1146 & n.18, Baylor was a practicing lawyer who claimed (to investors at least) to have experience with the precise issues as to which she is now being held liable.

## II.     The district court correctly granted summary judgment to the Commission on the securities registration claim.

Sections 5(a) and (c) of the Securities Act prohibit the "sale" and "offer for sale" of any securities unless a registration statement is in effect or there is an applicable exemption from registration. *Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) (per curiam).  A person who was a "'necessary participant' or 'substantial factor' in the violation" can be found liable under these provisions. *Zacharias*, 569 F.3d at 464.

Baylor does not dispute that interests in the instruments at issue in this case were securities, *see Lauer*, 52 F.3d at 670-71, nor does she contend that they were sold pursuant to any exemption from registration.  Rather, her sole argument on appeal is that *Pinter v. Dahl*, 486 U.S. 622 (1988), precludes a finding of liability here.  Br.16-17.

This Court has held, however, that *Pinter* "plainly is of no use" to a defendant in these circumstances. *Zacharias*, 569 F.3d at 467.  *Pinter* concerned Section 12(1) of the Securities Act, 15 U.S.C. 77*l*(a), a provision that makes a "§ 5

violator liable in rescission 'to the person purchasing a security *from him*.'"
*Zacharias*, 569 F.3d at 467 (quoting Section 12(1)) (emphasis added, alteration
omitted).  "Because of the 'purchase from' requirement," the Supreme Court in
*Pinter* held that Section 12(1) liability "'extends only to the person who
successfully solicits the purchase.'"  *Zacharias*, 569 F.3d at 467 (quoting *Pinter*,
486 U.S. at 647) (alteration omitted).  But Section 5 "does *not* include the
'purchase from' language or any equivalent," so *Pinter*'s analysis of liability under
Section 12(1) has no bearing on this case.  *Zacharias*, 569 F.3d at 467 (alteration
omitted); *accord SEC v. Phan*, 500 F.3d 895, 906 n.13 (9th Cir. 2007).

## III.   Baylor's challenge to the district court's imposition of remedies fails.

### A.      Baylor has forfeited any challenge to the district court's imposition of remedies.

Although a lawyer herself and represented by counsel in the district court,
Baylor did not make any argument as to remedies in her memorandum of law in
opposition to the Commission's motion for summary judgment.  *See generally* Dkt.
128.  In particular, Baylor did not dispute that the district court had discretion to
award disgorgement on a joint-and-several basis if she were found liable.  Nor did
she argue against the imposition of a third-tier civil penalty.  Because Baylor failed
to make these arguments in the district court, she should be precluded from raising
them on appeal.  *See District of Columbia v. Straus*, 590 F.3d 898, 903 (D.C. Cir.
2010).

**B.     The district court did not abuse its discretion in ordering disgorgement and a civil penalty.**

1.     Even if Baylor had preserved her objection to the district court's imposition of disgorgement, her arguments would fail on the merits. Disgorgement is "an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). District courts generally have "broad equitable power to fashion appropriate remedies for federal securities law violations." *SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011) (internal quotation marks omitted). Moreover courts have "broad discretion in subjecting the offending parties on a joint-and-several basis to the disgorgement order" when "two or more individuals or entities collaborate" in committing a violation. *Id. at* 10-11 (internal quotation marks omitted).

In determining disgorgement awards, courts employ a burden-shifting test. *First City Fin.*, 890 F.2d at 1231-32. Under that test, the Commission must first present a figure that "reasonably approximates the amount of unjust enrichment." *Id.* at 1232. If the Commission meets that burden, the burden shifts to the wrongdoer "clearly to demonstrate that the disgorgement figure [is] not a reasonable approximation." *Id.* Because the risk of uncertainty should fall on the wrongdoer, if the wrongdoer fails to carry that burden, the Commission's figure controls. *Id.*

- 34 -

Here, the district court acted well within its discretion in holding Baylor jointly and severally liable with the defendants for $2,665,000.  SA467.  This amount is supported by bank records showing that during the relevant period the defendants raised that sum from investors, and that $2.19 million out of that amount was initially deposited in Baylor & Jackson's IOLTA account.  *See* SA309-10, ¶¶70-72.

Baylor argues that the award was improper because she "only personally received $156,000."  Br.18.  If Baylor is objecting here to the imposition of joint-and-several liability, her argument is meritless in view of numerous cases holding that "joint-and-several liability is appropriate in securities cases" where, as here, two or more individuals or entities collaborate in engaging in the illegal conduct. *Whittemore*, 659 F.3d at 10 (internal quotation marks omitted).

To the extent that Baylor is contending that her "fees" were legitimate and do not represent ill-gotten gains from the fraud, this is just another attack on the district court's liability determination.  As such, the argument is meritless for the reasons discussed above.  As the district court reasoned, although "Baylor insists that she worked for fees, was only paid for work performed, and did not participate in any fraud," the record is "bereft of fee statements … to support [that] supposed work."  SA437; *see also id.* (observing that Baylor "never submitted fee statements to Milan or Mr. Pavlico").  This determination is well supported in the record.  *See*

- 35 -

SA325, Tr.149:1-4 (Baylor never submitted invoices to Milan); SA327, 155:18-22

(there were no formal billing records).

Moreover, that Baylor used her IOLTA account to funnel money to others is

further reason to hold her liable for the entire amount that was sent through that

account.  As this Court observed in *Whittemore*—also a case where funds were

funneled through an IOLTA account—"a person who controls the distribution of

illegally obtained funds is liable for the funds he or she dissipated as well as the

funds he or she retained."  659 F.3d at 9-10 (alteration and internal quotation

marks omitted).

2.     There is no merit to Baylor's objection to the district court's

imposition of third-tier civil penalties under Section 21(d)(3)(B) of the Exchange

Act, 15 U.S.C. 78u(d)(3)(B).  Penalties are appropriate under that provision if a

defendant's securities law violations involved "fraud, deceit, manipulation, or

deliberate or reckless disregard of a regulatory requirement [and such] violation

directly or indirectly resulted in substantial losses or created a significant risk of

substantial losses to other persons."  *Id.*

Baylor's sole argument on appeal with regard to penalties is that her

"conduct does not amount to fraud, deceit, or reckless disregard."  Br.18.  Again,

this is merely a challenge to the district court's liability determination, which fails

for the reasons discussed above.

- 36 -

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

ANNE K. SMALL
General Counsel

MICHAEL A. CONLEY
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

RANDALL W. QUINN
Assistant General Counsel

DANIEL STAROSELSKY
Senior Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-5774 (Staroselsky)

*/s/ Daniel Staroselsky*

July 2014

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,045 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Word Perfect in 14-Point Times New Roman.

  /s/ Daniel Staroselsky

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2014, I electronically filed the foregoing Brief of the Securities and Exchange Commission, Appellee, with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Upon acceptance of the electronic filing of the foregoing by the Clerk, I will cause eight paper copies of it to be hand-delivered to the Clerk's Office.

Service was accomplished on appellant Brynee K. Baylor via email at bbaylor@thebaylorlawgroup.com and by UPS overnight delivery to:

Brynee K. Baylor
1005 Willowleaf Way
Potomac, MD  20854

*/s/ Daniel Staroselsky*

# STATUTORY ADDENDUM

## STATUTORY ADDENDUM

Rule 10b-5 under the Securities Exchange Act of 1934, 17 C.F.R. 240.10b-5

provides:

It shall be unlawful for any person, directly or indirectly, by the use of

any means or instrumentality of interstate commerce, or of the mails

or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit
> to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under which
> they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.